**FILED**
**JUNE 2, 2015**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BURGESS VINEYARDS, LLC, a Washington Limited Liability Company, | ) ) ) | No. 32199-1-III |
| Respondent, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| PAUL BEVERIDGE and JANE DOE BEVERIDGE, husband and wife, dba WILDRIDGE WINERY & VINEYARD, | ) ) ) ) ) | |
| Appellants. | ) | |

LAWRENCE-BERREY, J. — Robert Paul Beveridge appeals a monetary judgment entered against him in favor of Paul Burgess. He contends the trial court erred by concluding that a late fee provision in the parties' contract was valid and enforceable. Specifically, he argues that the provision was an unenforceable penalty, the contract improperly modified the parties' original agreement, the contract is procedurally unconscionable, and that he is not personally liable to Mr. Burgess. We disagree and affirm the trial court.

No. 32199-1-III
*Burgess Vineyards v. Beveridge*

## FACTS

Robert Paul Beveridge, the owner of Wildridge Winery Vineyard in Seattle, Washington, and Paul Burgess, the owner of Burgess Vineyards, LLC, in Pasco, Washington, are both experienced businessmen. Mr. Burgess had been growing grapes since 1982. Mr. Beveridge, who has been a licensed attorney since 1985, formed Tapenade, Inc., a winemaking business, in 1988.

On September 28, 2010, Mr. Beveridge contacted Mr. Burgess via e-mail about the price of Mr. Burgess's Pinot Gris grapes. The next day, at 5:21 a.m., Mr. Burgess responded via e-mail that the sale price was $900 per ton. At 9:02 a.m., Mr. Beveridge responded: "Ok, let's plan to pick it on Friday or Saturday morning. I am working on setting up transportation. . . . Please send me directions to the vineyard, thanks." Ex. 2. Later that morning, Mr. Burgess wrote, "Thank you for purchasing my Pinot Gris winegrapes. . . . If you have any questions or concerns, please make sure that you communicate them with me personally. . . . Attached is the contract. Please review, sign and fax the signed contract to me tonite or tomorrow. I will look forward to hearing from you tomorrow so I can arrange my picking crew either Fri. or Sat. for a full day of harvesting." Ex. 2.

2

The e-mail included an attached contract stating that Mr. Burgess agreed to sell and Mr. Beveridge agreed to buy seven tons of hand-picked Pinot Gris at $900 per ton for a total order of $6,300. The contract also provided that Mr. Beveridge would pay a $2,000 deposit on the day of the harvest and the balance before December 15, 2010. In addition to the sale price and quantity of grapes, the Burgess contract provided for late fees and interest as follows:

> I (we) agree to the credit condition that should this contract or any associated monthly statement not be paid in full by the due date, a late fee of $200 per month in addition to a monthly finance charge of 1.5% (18% annual percentage rate) of the balance due, will be assessed and the account will be considered delinquent on C.O.D. terms.

Ex. 1.

On September 30, 2010, Mr. Beveridge acknowledged receipt of the Burgess contract, but advised Mr. Burgess, "I think the contract you attached is more appropriate for an annual contract rather than a spot deal. I have attached a draft that is more to the point. Please let me know if this is acceptable." Ex. 2. The purchase agreement submitted by Mr. Beveridge provided that "we agree . . . [t]o purchase 7 ton of Burgess Pasco Vineyard Pinot Gris and pay $900.00 per ton for it for a total price of $6,300." Ex. 2. It also stated that "[w]e will pay $2,000 of the purchase price on the date of harvest and the remaining $4,300 before December 15, 2010." Ex. 2. It did not include a late fee

or finance charge provision.

On October 1, 2010, Mr. Beveridge drove to Pasco, Washington, in a rented truck to pick up the grapes. He told Mr. Burgess that he preferred his own contract, but signed Mr. Burgess's contract and waited another day for Mr. Burgess's work crew to pick the grapes before returning to Seattle.

Mr. Beveridge paid the $2,000 down payment, but did not pay the balance by December 15. On December 22, 2010, he sent an e-mail to Mr. Burgess, stating "we are still waiting for our refund check from the IRS [Internal Revenue Service]. As soon as we receive the refund, we will pay all of our grape bills." Ex. 2. On February 10, 2011, at 7:50 p.m., Mr. Burgess wrote, "Your statement is attached. Please remit payment at your earliest convenience." Ex. 2. A little later that evening, Mr. Beveridge wrote, "The check went out earlier this week. Please let me know if you do not have it by Monday." Ex. 2. Mr. Burgess then sent an invoice dated March 1, 2011, which alleged that Mr. Beveridge owed $815.86 in interest and late fees. The letter stated:

> I have attached the Contract for Grapes signed 10/1/10 that outlines the finance charges and late fees that would be assessed if payments were untimely. Per our telephone conversation, I understand that you were waiting for your IRS check in order to pay the Invoice under this contract in full. However, that was not our agreement. Even though waiting for my payment was not to my liking, I am now following our agreement of late payments and interest.

4

> Attached is a Statement with updated late charges and interest per the signed Contract Agreement. Please know that this takes extra time and money on my part to keep track of the charges.
>
> Please make your final payment before March 15th in full, or you will incur additional interest and another $200 late fee.

Ex. 3. The statement also indicated that the $4,300 balance had been paid on February 10, 2011.

The parties did not communicate again until January 23, 2012, when Mr. Burgess e-mailed an invoice to his attorney, which was forwarded to Mr. Beveridge, prompting him to respond, "I am sorry that you feel that you should continue pursuing this matter. Your position is not commercially reasonable, particularly for a spot market purchase at the end of harvest. I was very clear to you from the beginning that we could not pay for the grapes until we received our IRS refund. We have never paid interest to any other grower in our over 20 year history." Ex. 2.

Mr. Burgess filed a lawsuit on April 17, 2012, asking for $3,334.62 with additional late fees and expenses after January 15, 2012. At trial, Mr. Burgess testified that he and Mr. Beveridge agreed that Mr. Beveridge would put $2,000 down and pay the balance on December 15, 2010. He characterized Mr. Beveridge's claim that he told Mr. Burgess that payment of the balance would occur after receipt of a tax refund as "pure fabrication." Report of Proceedings (RP) at 60. Mr. Burgess explained that he "rarely"

sells grapes on credit "[b]ecause you don't get paid." RP at 15. He also testified that while they were waiting for the grapes to be picked, Mr. Beveridge pushed a different contract at him, stating "'[t]his is more appropriate.'" RP at 17. Mr. Burgess denied signing Mr. Beveridge's contract. According to Mr. Burgess, Mr. Beveridge stated that he preferred his own contract, but Mr. Burgess responded that this was his standard contract, and that Mr. Beveridge signed it. Mr. Burgess was emphatic that he would not have allowed the grapes to be picked if Mr. Beveridge had not signed the contract.

During cross-examination, Mr. Burgess explained that part of the reason for the $200 late fees is to induce timely payment. He testified that he stopped dealing with the buyers who would not pay pursuant to the contract, stating, "They pay when they feel like it. And I have to pay my workers, not when I feel like it. . . . [W]hen I get a winemaker/lawyer that doesn't want to pay according to the agreement, that adds a lot of stress." RP at 31.

Mr. Beveridge countered that the parties had two agreements and that "only the terms that are common to both agreements may be enforced as a matter of law, because those are the only terms where there was a meeting of the minds." RP at 11. He testified that he thought the parties had reached an agreement on September 29, 2010, that he was going to buy seven tons of grapes at $900 a ton and "in reliance on that I was going to

rent a truck, drive it out there and pick up the grapes." RP at 40. He admitted that he read Mr. Burgess's contract "a couple of days beforehand," but found it the "most outrageous and one-sided contract I had ever seen in my experience." RP at 53, 41. He claimed that he felt "tricked" when Mr. Burgess insisted he sign the contract, but that he signed it because he felt threatened and outnumbered: "I was concerned. I was in the middle of nowhere, a place I'd never been before. It was 200 miles from home. Mr. Burgess was very adamant, and he had his crew behind him, and so I signed the agreement, the second contract, knowing there's no meeting of the minds on any of the issues." RP at 43. He also testified that he felt physically threatened because seven or eight of the workers "were watching us having our little discussion at the back of the truck. I just wanted to get out of Dodge. . . . [I]t would have been very uncomfortable if I hadn't signed the contract." RP at 43. Mr. Burgess stated:

> . . . [The workers] don't even know my name. I call a few people that I know, and they do me the favor of calling their friends or people, and they come and pick grapes. I pay them. . . . They picked the grapes, and then they left. Generally most of the laborers don't even know who I am. They don't have any loyalty to me. I pay them an hourly wage. They pick the grapes. They do their job. I pay them.
>
> . . . .
>
> . . . We're not thugs. We're grape growers, and those guys work hard picking. It's very hard work.

RP at 59-60.

Mr. Beveridge testified that he told Mr. Burgess that his ability to pay was dependent on receiving a tax refund, stating, "I remember telling [Mr. Burgess] that December 15th was the goal but that I was not in control of when I would receive the IRS check." RP at 45. He also claimed that he and Mr. Burgess did not discuss penalties. During argument, counsel for Mr. Beveridge argued that a $200 per month late fee was an unconscionable penalty, stating "[t]his is literally the Rumpelstiltskin case. $80 worth of straw, and I'm going to spin that into 7500 bucks because he signed my agreement and therefore it's binding. Well, it's not." RP at 70.

The court concluded that the contract was enforceable and the monthly late fee was appropriate to account for the time and inconvenience of collecting on a delinquent account. The court did not find the contract unconscionable, noting that although the terms were "strict," they were warranted by the realities of the business and the need to account for "the stress, the time it took to prepare the invoices, and the hassle of having to collect." RP at 80. The court also rejected Mr. Beveridge's argument that he feared for his physical safety, stating, "The Court does not find that to be a reasonable fear and does not believe that it is or was coercive. Oftentimes farmers have a number of people . . . running around doing a whole host of different things. In this case they were workers

8

who were picking grapes, in fact picking grapes for Mr. Beveridge." RP at 78.

As to Mr. Beveridge's testimony that he told Mr. Burgess that he could not pay until he received a tax refund, the court found it significant that neither contract reflected this point, stating, "[Y]ou can't modify this contract with a statement by one side saying that this happened when in fact, even his own agreement, does not indicate that." RP at 79. The court also found it significant that Mr. Beveridge is an attorney and "presumably understands contracts and understands what the terms are. So when he signed that document, he understood what it meant and what the penalties were if he did not comply with it." RP at 79.

The court entered written findings of fact stating that (1) the parties verbally agreed about the price, tonnage, and quantity of grapes to be sold; (2) the written contract on the form provided by Burgess Vineyard and all the attendant terms was the agreement that was reached by the parties on October 1, 2010; (3) Mr. Beveridge, as a licensed attorney in Washington, was familiar with contracts and the terms of this contract, including his personal guaranty; (4) Mr. Beveridge's testimony about an income tax refund was not credible; (5) if such a discussion occurred, it should have been memorialized; (6) Mr. Beveridge breached the payment provisions; (7) the $200 late fee provision was a reasonable charge; and (8) the amount due as of April 15, 2013, was

9

$7,506.92.

## ANALYSIS

### *Whether the trial court erred in concluding the contract was enforceable.*

The primary issue before us is whether the trial court erred in upholding the late fee provision in the Burgess contract. Mr. Beveridge contends that the late fee provision is an unenforceable penalty unrelated to actual damages. He also argues that the contract constitutes a modification unsupported by additional consideration, the contract is procedurally unconscionable, and that he is not personally liable to Mr. Burgess. We evaluate each of these arguments in turn.

### *Unenforceable Penalty*

Mr. Beveridge first asserts that the trial court erred in concluding that the $200 monthly late fee was a reasonable charge that accounted for the time and inconvenience of collecting on a delinquent account. Specifically, he argues that the late fee is an unenforceable penalty because it is designed as a punishment for default, rather than as compensation for actual damages. Mr. Beveridge contends that Mr. Burgess cannot point to any actual financial loss as a result of the late payment and that he failed to provide a rational basis for setting the amount at $200 per month. He argues, "Burgess lost $80.37 in statutory interest on the $4,300.00 he was owed for 57 days. Nevertheless, he wants to

be compensated, *on a monthly basis*, by way of a late fee charge which is 2.5 times greater that his actual loss." Br. of Appellant at 15 (emphasis in original).

"Whether an enforceable contract exists is a question of law that we review de novo." *Taufen v. Estate of Kirpes*, 155 Wn. App. 598, 603, 230 P.3d 199 (2010). "In Washington, a provision for liquidated damages will be upheld unless it is a penalty or otherwise unlawful." *Wallace Real Estate Inv. Inc. v. Groves*, 124 Wn.2d 881, 886, 881 P.2d 1010 (1994). A liquidated damages agreement that is fairly and understandably entered into by experienced parties, with a view to just compensation for the anticipated loss, should be enforced. *Walter Implement, Inc. v. Focht*, 107 Wn.2d 553, 558, 730 P.2d 1340 (1987). A liquidated damages provision permits parties to allocate risks, lend certainty to the parties' agreements, and permits parties to resolve disputes in the event of a breach. *Watson v. Ingram*, 124 Wn.2d 845, 851, 881 P.2d 247 (1994).

In determining whether a liquidated damages provision is enforceable, the court looks to whether the provision is a reasonable prospective estimate of loss. *Wallace*, 124 Wn.2d at 897. The party seeking to enforce a liquidated damages provision does not need to prove actual damages. *Id.* at 893. However, a provision that bears no reasonable relationship to actual damages will be construed as a penalty. *Walter Implement*, 107 Wn.2d at 559 (quoting *Nw. Collectors, Inc. v. Enders*, 74 Wn.2d 585, 594, 446 P.2d 200

11

(1968)). The reasonableness of the prospective estimate of loss is judged as of the time the contract was entered. *Id.* at 559. If there is any reasonable relationship, the liquidated damages clause must be enforced. *Brower Co. v. Garrison*, 2 Wn. App. 424, 432-33, 468 P.2d 469 (1970).

Applying these principles, the trial court did not err in upholding the late fee. Contrary to Mr. Beveridge's position, the fact that the late fee provision had a potentially coercive effect does not necessarily render it a penalty. We also look at other factors, bearing in mind that an appropriate late fee provision may compensate for the expense and inconvenience of collecting a late payment or as incentive to timely pay. As Mr. Burgess observed, "Grape growers are not debt collectors. In order to collect on debts, a grape grower must perform a myriad of administrative functions that have nothing to do with growing and picking grapes." Br. of Resp't at 10.

A significant, if not dispositive, factor in this case is Mr. Beveridge's sophistication. In determining the reasonableness of a liquidated damages provision, we consider the bargaining power and experience of the parties, recognizing that "[t]he sophistication factor may point to the increased enforceability of liquidated damages provisions in commercial agreements." *Wallace*, 124 Wn.2d at 896. In *Wallace*, the buyer, a businessman with experience negotiating and writing purchase and sales

agreements, challenged a liquidated damages provision as an unenforceable penalty. *Wallace*, 124 Wn.2d at 896-97. In upholding the provision, the court found the buyer's sophistication a factor of "particular significance in discussing the reasonableness of these extension payments." *Id.* at 896. The court concluded that the buyer's expertise not only supported the enforceability of the liquidated damages provision, but also "highlight[ed] the inequity of allowing him to now challenge the provisions as penalties simply because they constitute too large a percentage of the contract price." *Id.* at 897.

Other cases have also found party sophistication a particularly relevant factor in determining the reasonableness of a liquidated damages provision. For example, in *Walter Implement*, the Supreme Court upheld a liquidated damages provision, citing the "experienced, equal parties." *Walter Implement*, 107 Wn.2d at 558. Similarly, in *Brower*, the court found the fact that the parties "were all experienced businessmen" a significant factor in supporting the reasonableness of the liquidated damages provision. *Brower*, 2 Wn. App. at 434.

Here, both Mr. Burgess and Mr. Beveridge have been involved in the wine business for over 20 years. Mr. Beveridge has been licensed to practice law since 1985 and has been in the wine business since 1988. As an attorney and businessman, he presumably has experience with purchase and sale contracts. Although he claims that in

13

all of his years in the wine business he has never seen a late fee provision, Mr. Beveridge should know that there are administrative costs associated with recovering past due amounts.

Moreover, Mr. Beveridge testified that he read the contract before signing it. The contract unambiguously provided for late fees and given Mr. Beveridge's experience, we presume that he understood the terms of the contract and the penalties for noncompliance. The amount the experienced parties signed off on, $200 per month, is a reasonable forecast of potential damages and allowed the parties to allocate risk. It would be unfair to allow a lawyer and businessman with Mr. Beveridge's expertise to challenge the provision as an unfair penalty because he thinks the amount is excessive. "[A]n agreement fairly and understandingly entered into with a view to just compensation for an anticipated loss should . . . be enforced." *Nw. Collectors*, 74 Wn.2d at 594. Under our facts, the late fee provision was reasonable and therefore enforceable. The trial court properly factored in Mr. Beveridge's sophistication and correctly ruled that the late fees and finance charges were reasonable sums for servicing a delinquent account.

### *Modification*

Mr. Beveridge next argues that the Burgess contract is a modification of the parties' original agreement, which he claims was limited to the price and quantity of the

grapes. He argues that the Burgess contract modified the parties' agreement by adding a personal guaranty, the late fee and interest provisions, and a one-sided attorney fees clause. Citing *Tacoma Fixture Co. v. Rudd Co.*, 142 Wn. App. 547, 174 P.3d 721 (2008), Mr. Beveridge maintains that any terms outside of the original agreement must be supported by additional consideration and only those terms common to both agreements may be enforced.

However, Mr. Beveridge points to no evidence that undermines the court's finding that the Burgess contract represented the complete agreement of the parties. If he did not wish to be bound by the terms of the contract, he should not have signed it. He could have made an unequivocal objection and returned to Seattle. Instead, he signed the contract and allowed the grapes to be picked and loaded in his truck.

Moreover, *Tacoma Fixture* does not help him. The issue in that case was whether additional terms included in an invoice became part of the contract. *Id.* at 554. The court held that because the parties had orally formed a contract before the invoice was received, the invoicing party could not unilaterally modify the contract through the addition of terms in its invoices. *Id.* at 554-55. The *Tacoma Fixture* court analyzed the issue under Uniform Commercial Code (UCC) § 2-207, which applies where there has been no express acceptance of terms on conflicting forms offered by the parties to an agreement.

15

Where, as here, the terms of a contract were expressly accepted, the discussion involves contract formation under RCW 62A.2-204, not alteration under RCW 62A.2-207. *M.A. Mortenson Co. v. Timberline Software Corp.*, 140 Wn.2d 568, 579-80, 998 P.2d 305 (2000).

However, even if we assume, without deciding, that the Burgess contract is a modification of the parties' existing agreement, it is still enforceable. Washington's version of the UCC states that "[a]n agreement modifying a contract within this Article needs no consideration to be binding." RCW 62A.2-209. The parties must only abide by the duty of good faith that applies to every contract under the UCC. RCW 62A.1-304. Mr. Beveridge had ample time to review the contract, and there was no action by Mr. Burgess that could be construed as bad faith dealing.

*Procedural Unconscionability*

Mr. Beveridge further contends that the trial court erred by enforcing the agreement against him because it was procedurally unconscionable. He contends that if he had known that Mr. Burgess would not provide the grapes unless he signed the Burgess contract, he would not have rented a truck and driven from Seattle to Pasco. In addition to feeling tricked by Mr. Burgess, Mr. Beveridge also maintains that he felt threatened by Mr. Burgess's work crew and therefore "lacked a meaningful choice" when

16

he signed the contract. Br. of Appellant at 19. His assertions are unavailing.

Procedural unconscionability involves "blatant unfairness in the bargaining process and a lack of meaningful choice" considering all the circumstances surrounding the transaction, including the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in the fine print. *Torgerson v. One Lincoln Tower, LLC*, 166 Wn.2d 510, 518, 210 P.3d 318 (2009). The existence of an unconscionable bargain is a question of law. *Nelson v. McGoldrick*, 127 Wn.2d 124, 131, 896 P.2d 1258 (1995).

Mr. Beveridge fails to show that the agreement was procedurally unconscionable. The trial court concluded that Mr. Beveridge's purported fear of Mr. Burgess's work crew was unreasonable given that farmers often have a number of people working for them and that in this case the workers were picking grapes for Mr. Beveridge. Also, Mr. Beveridge's status as an attorney significantly undermines his claim that he was tricked into signing the contract. In view of all of the circumstances, Mr. Beveridge had a meaningful choice and the opportunity to understand the terms of the contract. As noted above, he read and understood the terms of the contract before signing it. Finally, the terms were not "hidden in a maze of fine print,"[1] but were clearly stated in a short

---

[1] *Torgerson*, 166 Wn.2d at 519 (quoting *Yakima County (W. Valley) Fire Prot.*

paragraph at the end of the contract. Ex. 1.

### *Personal Guaranty*

Finally, Mr. Beveridge assigns error to the court's conclusion of law II that found Mr. Beveridge personally liable to Mr. Burgess. He asserts that he did not "objectively manifest assent to personal liability," arguing that when he was "confronted at the vineyard and left with no other meaningful choice but to sign the Burgess contract, he crossed out his name at the top of page 1 to signify this was a transaction with Tapenade, Inc., not him personally." Br. of Appellant at 20-21. He claims that by crossing his name off the contract, he objectively manifested his intent not to be personally liable or bound by the terms of the Burgess contract. His argument fails.

Washington courts "have long adhered to the objective manifestation theory of contracts. This theory means that we impute to a person an intention corresponding to the reasonable meaning of his words and acts." *Dwelley v. Chesterfield*, 88 Wn.2d 331, 335, 560 P.2d 353 (1977). Here, the trial court found "that the defendant R. Paul Beveridge, as a Washington lawyer, was familiar with contracts and the terms of this contract, including the personal guaranty by R. Paul Beveridge." CP at 15. We review the court's finding for substantial evidence and "[i]f that standard is satisfied, we will not substitute

---

*Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 391, 858 P.2d 245 (1993)).

18

our judgment for that of the trial court even though we might have resolved disputed facts differently." *Green v. Normandy Park Riviera Section Cmty. Club, Inc.*, 137 Wn. App. 665, 689, 151 P.3d 1038 (2007).

Mr. Beveridge's argument ignores the fact that the guaranty provision does not distinguish between individuals and companies. The provision states: "The undersigned individual(s) personally guarantee the performance of the entity for which he/she is signing." Ex. 1. By signing immediately below this provision, Mr. Beveridge personally guaranteed the provisions he now disputes. He contends that his objection to the guarantee was clearly manifested. However, Mr. Burgess correctly points out that a man of Mr. Beveridge's sophistication could have crossed out the personal guaranty provision or refused to sign the contract altogether. Mr. Beveridge knew that Mr. Burgess was demanding Mr. Beveridge's personal assurance as consideration for the extension of credit; yet, instead of clearly objecting, Mr. Beveridge signed the contract with the guaranty provision intact. His actions are sufficient to impute an intent to personally guarantee payment of the late fees.

The trial court did not err in enforcing the Burgess contract.

19

*Attorney Fees*

Mr. Burgess requests attorney fees on appeal. The contract provides:

If a past due account is placed in the hands of any attorney or agency for collection or to foreclose any security, the person(s) or company owing the account shall pay all reasonable costs, fees and expenses incurred by Burgess Vineyards including without limitation, reasonable attorney fees (with or without litigation) and court costs.

Ex. 1.

Under the attorney fees statute, RCW 4.84.330, the prevailing party in an action to enforce or defend a contract is entitled to attorney fees and costs on appeal where, as here, the contract so provides. *Reeves v. McClain*, 56 Wn. App. 301, 311, 783 P.2d 606 (1989). Mr. Burgess has prevailed. Therefore, subject to his compliance with RAP 18.1, we award Mr. Burgess his reasonable costs and attorney fees incurred in this appeal.

Affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____      _____
Siddoway, C.J.                 Brown, J.

20